UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

CREDIT SUISSE AG, Cayman Islands Branch
as Administrative Agent, Collateral Agent and
Credit Agreement Agent,

Plaintiff,

-against-

APPALOOSA INVESTMENT LIMITED
PARTNERSHIP I, BOKF, N.A., CENTERBRIDGE
CREDIT PARTNERS MASTER LP, DELAWARE
TRUST COMPANY, OAKTREE FF INVESTMENT
FUND LP, OCM OPPORTUNITIES FUND VI, L.P.,
PALOMINO FUND, LTD., SPECIAL VALUE
EXPANSION FUND, LLC, TENNENBAUM
OPPORTUNITIES PARTNER V, LP and
WILMINGTON SAVINGS FUND SOCIETY, FSB,

Defendants.

------------------------------------------------------------- X

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/9/15**

OPINION AND
ORDER

15-cv-3474(SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.   INTRODUCTION

This action arises out of an Intercreditor Agreement (the "ICA")

between first and second priority creditors of Caesars Entertainment Operating

Company ("CEOC").[1]  Plaintiff Credit Suisse AG, Cayman Islands Branch

("Credit Suisse"), is an agent for certain first priority creditors of CEOC (the "First

---

[1]     *See* 12/24/08 Intercreditor Agreement, Ex. A to Amended Complaint
("Complaint").

Lien Secured Parties"), and defendants, as described more fully herein, are either indenture trustees for second priority creditors or second priority creditors themselves.  On January 15, 2015, CEOC and certain of its affiliates (the "Debtors"), filed petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Case" or the "Voluntary Case").  Three months later, on April 7, plaintiff filed this action in New York State Supreme Court.  The Debtors are not parties to this action.

Defendants removed this action to this Court pursuant to the bankruptcy removal statute.[2]  They now seek an order transferring the action to the Northern District of Illinois pursuant to either the bankruptcy venue statute[3] or the general venue statute.[4]  Plaintiff cross-moves, asserting that this Court is required to abstain from hearing this case under section 1334(c)(2) of Title 28 of the United

---

[2]	*See* 28 U.S.C. § 1452(a) ("A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.").

[3]	*See id.* § 1412 ("A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.").

[4]	*See id.* § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.").

States Code or, in the alternative, that the case should be equitably remanded to the New York State Supreme Court under section 1452(b).  For the following reasons plaintiff's motion is DENIED and defendants' motion is GRANTED.

## II.   BACKGROUND

### A.   The Parties

#### 1.   Credit Suisse and the Debtors' Debt Structure

The Complaint states that Credit Suisse has the authority to enforce the terms of the ICA for the benefit of holders of: (i) CEOC's first lien bank debt (the "First Lien Bank Debt"), which was issued by CEOC pursuant to a Third Amended and Restated Credit Agreement dated as of July 25, 2014 (the "Credit Agreement") and (ii) first lien notes issued by CEOC (the "First Lien Notes") and governed by Indentures dated June 10, 2009, February 14, 2012, August 22, 2012, and February 15, 2013, respectively (the "First Lien Indentures").[5]  Thus, the First Lien Secured Parties represented by Credit Suisse include the holders of the First Lien Bank Debt and the First Lien Notes, as well as UMB Bank, NA ("UMB"), the

---

[5]     *See* Complaint ¶ 8. There are two additional Intercreditor Agreements. The first, dated January 28, 2008, governs the relationship between first lien creditors and certain of CEOC's unsecured noteholders.  The third, dated June 10, 2009, governs the relationship among holders of CEOC's First Lien Bank Debt and First Lien Notes.  *See id.* ¶ 4.

Indenture Trustee for the First Lien Notes.[6]  The Complaint explains that as of the filing of the Bankruptcy Case, CEOC's debt structure included the following: (i) the First Lien Bank Debt governed by the Credit Agreement; (ii) the First Lien Notes governed by the First Lien Notes Indentures; (iii) three series of Second Lien Notes governed by Second Lien Indentures dated December 24, 2008 (the "2008 Indenture"), April 15, 2009 (the "2009 Indenture"), and April 16, 2010 (the "2010 Indenture"); and (iv) four series of Unsecured Notes, some of which were issued as early as May 27, 2005.[7]

Although the ICA was executed in 2008, it governs the priority of subsequent debt issuances as well.  This includes CEOC's spring 2014 transaction which raised a new tranche of First Lien Bank Debt in the amount of $1.75 billion (the "B-7 Transaction").  "Proceeds of the B-7 Transaction were used to pay down a portion of existing debt issued by CEOC, including debt issued under other tranches of the Credit Agreement."[8]

As security for all obligations owing to the First Lien Secured Parties, CEOC "granted first priority liens and mortgages on, security interests in, and

---

[6]   *See id.* ¶ 4.

[7]   *See id.* ¶ 22.

[8]   *Id.* ¶ 5.

4

collateral assignments, charges, or pledges of [Common] Collateral" (the "First Priority Liens").[9]  According to Credit Suisse, the First Lien Secured Parties made applicable UCC filings and mortgage recordings to perfect the First Priority Liens. In addition, as is relevant here, on October 15 and 16, 2014, the First Lien Secured Parties entered into certain deposit account control agreements ("DACAs") with U.S. Bank National Association and Wells Fargo Bank, National Association, to perfect certain of the First Priority Liens.[10]

### 2.    Defendants, the Wilmington Action, and the Bankruptcy Cases

Each defendant is either an indenture trustee for second priority creditors or a second priority creditor itself.  As such, each defendant is subject to the ICA.

### a.    WSFS and the Wilmington Action

Defendant Wilmington Savings Fund Society, FSB ("WSFS"), is a successor Trustee under the 2009 Indenture.[11]  On August 4, 2014, WSFS, acting in its capacity as Indenture Trustee, filed a lawsuit in Delaware Chancery Court against CEOC and other parties (the "Wilmington Action").  The suit alleges

---

[9]      *Id.* ¶ 23.

[10]     *See id.* ¶ 24.

[11]     *See id.* ¶ 18.

fraudulent transfers, breaches of fiduciary duty, and claims arising from a payment guarantee of CEOC's parent, Caesars Entertainment Corporation ("CEC").[12]  The alleged fraudulent conveyances include the transfer of eight lucrative casino, hotel, and entertainment properties in Las Vegas, New Orleans, and Baltimore, as well as valuable intellectual rights and CEOC's internet gaming business (the "Property Transfers").  The Complaint alleges that the Property Transfers involve the transfer of "Common Collateral" within the meaning of the ICA.[13]

### b.    The Petitioning Creditors and the Involuntary Case

Defendants Appaloosa Investment Limited Partnership I ("Appaloosa"), OCM Opportunities Funds VI, L.P. ("OCM"), and Special Value Expansion Fund, LLC (the "Petitioning Creditors"), are all holders of Second Lien Notes.[14]  On January 12, 2015, the Petitioning Creditors filed an involuntary petition under chapter 11 of the Bankruptcy Code against CEOC in the United States Bankruptcy Court for the District of Delaware (the "Involuntary Case").[15]

The timing of the Involuntary Case was no accident.  On December

---

[12]    *See id.* ¶ 35.

[13]    *See id.*

[14]    *See id.* ¶¶ 9, 14, 16.

[15]    *See id.* ¶ 37.

19, 2014, CEC and CEOC publicly disclosed in Form 8-K filings with the Securities and Exchange Commission that they had entered into a restructuring support agreement (the "RSA") with certain holders of First Lien Notes that would require CEOC to file a chapter 11 case on or after January 15, 2015, but no later than January 20, 2015.[16]  "It thus was widely known that CEOC hoped to file for Chapter 11 protection to implement the restructuring in the window between Jan[uary] 15 and Jan[uary] 20."[17]  According to the Complaint, the Petitioning Creditors deliberately timed the filing of the Involuntary Case so that it would occur fewer than ninety days after CEOC executed the DACAs, so that the Petitioning Creditors could seek to avoid the perfection of such liens as a preference under section 547 of the Bankruptcy Code.[18]

The Petitioning Creditors also filed a motion requesting the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code.[19] The filing of the Involuntary Case resulted in an automatic stay, pursuant to section 362(a) of the Bankruptcy Code, of all but two of the claims asserted in

---

[16]  *See id.* ¶ 36.

[17]  *Id.* (internal quotation marks and alterations omitted).

[18]  *See id.* ¶ 38.

[19]  *See id.* ¶ 44.

the Wilmington Action.[20]  On January 28, 2015, the Delaware Bankruptcy Court

transferred the Involuntary Case to the Northern District of Illinois, where the

Voluntary Case had been pending since January 15.  However, the Petitioning

Creditors have made a motion in the Illinois Bankruptcy Court to consolidate the

Involuntary Case with the Voluntary Case.  According to the Complaint, "[t]he

only reason to make such a request is . . . to preserve the ability of the Petitioning

[Creditors, WSFS,] or others to attack as a preference the DACAs . . . ."[21]

### c. The Committee Defendants

Defendant BOKF, N.A. ("BOKF") is the successor Trustee and

Collateral Agent under the 2010 Indenture.[22]  Defendant Delaware Trust Company

("DTC") is successor Trustee and Collateral Agent under the 2008 Indenture.[23]

Defendants Centerbridge Credit Partners Master LP, Oaktree FF Investment Fund

LP ("Oaktree"), Palomino Fund, Ltd. ("Palomino"), Tennenbaum Opportunities

Partner V, LP ("Tennenbaum"), are the holders of Second Lien Notes.[24]

---

[20]     Those are the claims against CEC to enforce the payment guarantee.

[21]     *Id.* ¶ 42.

[22]     *See id.* ¶ 10.

[23]     *See id.* ¶ 12.

[24]     *See id.* ¶¶ 11, 13, 15, 17.  Defendant Oaktree is an affiliate of
Petitioning Creditor OCM; Tennenbaum is an affiliate of Petitioning Creditor
Special Value Expansion Fund; and Palomino is an affiliate of Petitioning Creditor

On February 5, 2015, the United States Trustee appointed these Second Lien Note holders, together with BOKF, DTC, and WSFS (together, the "Committee Defendants"), to the Official Committee of Second Priority Noteholders (the "Committee") pursuant to section 1102 of the Bankruptcy Code.[25] Thereafter, the Committee filed a motion for appointment of an examiner.[26]

### B.     The ICA

The purpose of the ICA is to preserve the priority of first lien debt.  It gives the First Lien Secured Parties the exclusive right to "enforce rights [and] exercise remedies . . . with respect to . . . Common Collateral," which includes substantially all of the present and future property of CEOC and the other Debtors.[27]  "[U]ntil the First Lien Secured Parties are paid in full in cash, the Intercreditor Agreement entitles the First Lien Secured Parties priority of recovery from collateral vis-à-vis holders of Second Lien Notes, such as the Defendants."[28]

Under section 4.1 of the ICA, this priority includes the right to

-------------------------------------------------------------------------------

Defendant Appaloosa.  *See* 6/11/15 Declaration of Joshua M. Mester, counsel to defendants, in Support of Motion to Transfer, ¶ 6.

[25]     *See* Complaint ¶ 47.

[26]     *See id.* ¶ 49.

[27]     ICA §§ 1.1, 3.1(a)(ii).

[28]     Complaint ¶ 28.

payment from "the sale or other disposition of, or collection on, such Common Collateral . . . upon the exercise of remedies as a secured party."[29]  Section 3.1(a)(ii) provides that the First Lien Secured Parties have the exclusive right to enforce rights and exercise remedies with respect to Common Collateral, until such time as they are paid in full.[30]  According to the Complaint, "[t]his right includes instituting court actions to enforce such rights or remedies — including actions asserting fraudulent transfer or avoidance claims."[31]  Section 2.2 prohibits Second Lien Holders or their Indenture Trustees from taking "any action to challenge . . ., directly or indirectly, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection, priority or enforceability of . . . a Lien securing any" debt owed to the First Lien Creditors.[32]

Notably, section 8.7 is a forum selection clause.  It states that the parties

> consent to the nonexclusive jurisdiction of any state or federal court located in New York County, New York, [and that] . . . [t]he parties hereto waive any objection to any action instituted hereunder in any such court based on *forum non conveniens*, and

---

[29]   *Id.* (internal quotation marks omitted).

[30]   *See id.* ¶ 29.

[31]   *Id.*

[32]   *Id.* ¶ 30 (internal quotation marks omitted).

any objection to the venue of any action instituted hereunder in any such court.

## C.    The Removed Claims

The Complaint alleges that defendants, as "holders of CEOC Second Lien Notes," breached the ICA by "tak[ing] actions that are deliberately intended to result (and have resulted in) challenges to or the invalidation of First Lien Secured Parties' liens on certain CEOC assets or to impermissibly receive and/or collect Common Collateral . . . that is due first to holders of First Lien Bank Debt."[33]  The First Cause of Action seeks declaratory and injunctive relief against WSFS, alleging that WSFS breached the ICA by, among other things, seeking to enforce rights and remedies with respect to Common Collateral; to recover money damages before the debts owed to the First Lien Secured Parties are discharged; and to challenge the B-7 Transaction.  This conduct "directly attacks the validity, perfection, priority or enforceability of certain of the First Priority Liens, in violation of section 2.2 of the Intercreditor Agreement."[34]

The Second Cause of Action seeks declaratory and injunctive relief against the Petitioning Creditors and WSFS in connection with the involuntary

---

[33]    *Id.* ¶ 6.

[34]    *Id.* ¶¶ 53-57.

11

petition and other actions contesting the First Priority Liens.[35]  Among other things, Credit Suisse alleges that seeking to avoid the DACAs is precluded by the ICA.[36]  The Complaint states that WSFS "participated in this breach of the Intercreditor Agreement when, acting as Trustee for the Second Priority Secured Parties, it appeared in the Involuntary Case and took actions to support the [Petitioning Creditors.]"[37]  Furthermore, the Petitioning Creditors and WSFS "contested or supported others in contesting the First Priority Liens by requesting an examiner to . . . investigate the Property Transfers, the B-7 Transactions, and the perfection of certain of the First Priority Liens through the DACAs, in both Delaware and Illinois."[38]

The Third Cause of Action is against the Committee Defendants.[39] The Complaint notes that on February 13, 2015, "the Debtor took the almost unprecedented action of requesting an examiner to investigate certain of *its own actions* while solvent — namely, the pre-petition transfer of a number of its hotels

---

[35]     *See id.* ¶¶ 59-64.

[36]     *See id.* ¶ 60.

[37]     *Id.* ¶ 61.

[38]     *Id.* ¶ 63.

[39]     *See id.* ¶¶ 47-51, 66-73.

and casinos."[40]  On February 17, 2015, the Committee Defendants filed a motion

seeking the appointment of an examiner (the "Second Examiner Motion").  Credit

Suisse alleges that the "primary purpose of the Second Examiner Motion was to

cause any examiner . . . to investigate . . . the Property Transfers, the B-7

Transaction, and the DACAs" in violation of the ICA.[41]

By bringing this action, Credit Suisse seeks to:

a.     Enjoin Defendants, including every member of the
       Committee, "from taking any action to challenge, contest or
       support any other person in contesting or challenging,
       directly or indirectly, in any proceeding (including in
       CEOC's bankruptcy proceedings), the validity, perfection,
       priority or enforceability of any of the Bank Debt Liens";[42]
b.     Enjoin Defendants, including every member of the
       Committee, "from taking any action to enforce rights or
       exercise remedies with respect to the Property Transfers or
       the B-7 Transaction";[43]
c.     Enjoin Defendants "from seeking to recover or causing the
       [Committee] to seek to recover for any professional fees
       incurred in connection with any action that violates the
       Intercreditor Agreement";[44] and
d.     Require the Defendants "to segregate and pay over for the
       benefit of holders of First Lien Debt any Common
       Collateral or proceeds thereof received by the holders of

---

[40]    *Id.* ¶ 48 (emphasis in original).

[41]    *Id.* ¶ 49.

[42]    *Id.* at ¶ 75.

[43]    *Id.* at ¶ 76.

[44]    *Id.* at ¶ 77.

Second Lien Notes, including but not limited to any professional fees paid out of the Common Collateral or proceeds thereof," including amounts paid to members of or professionals appointed to represent the Committee.[45]

### D.   Earlier Related Proceedings

#### 1.   Motion to Disband the Committee

On February 19, 2015, a motion was filed by the Debtors in the Voluntary Case seeking to disband the Committee.  The Debtors asserted three grounds for relief, the first of which was that "an intercreditor agreement to which each Committee member is a party would prevent the Committee from performing many of its statutory functions" under section 1103(c) of the Bankruptcy Code.[46] "UMB Bank, the first lien notes indenture trustee . . ., the Ad Hoc Committee of First Lien Noteholders and the Ad Hoc Committee of First Lien Bank Lenders," all first lien holders represented by Credit Suisse under the ICA, joined the Debtors' motion.[47]  These first lien holders represent $11.6 billion of CEOC's first lien debt.[48]

---

[45]     *Id.* at ¶ 78.

[46]     3/9/15 Memorandum Opinion by Judge A. Benjamin Goldgar, Bankr. N.D. Ill. 15-01145, ECF No. 633 ("Committee Order"), at 3.

[47]     *Id.*

[48]     *See* Defendants' Memorandum in Support of Motion to Transfer Venue ("Transfer Mem."), at 9.

On March 9, 2015, the Bankruptcy Court denied the motion.  The Bankruptcy Court explained that under section 1102 of the Bankruptcy Code, the United States Trustee was entrusted with the authority to appoint creditors committees, and that a bankruptcy court's power with respect to such committees was circumscribed.[49]  The court explained that "nothing in section 1102(a) confers on the court the power to disband a committee a U.S. Trustee has appointed under section 1102(a)(1)."[50]  The court further held that section 105(a) did not provide a basis to disband the Committee.[51]

### 2. Objections to the Committee's Retention of Professionals

The Ad Hoc First Lien Noteholder Committee and UMB objected to the Committee's applications to retain professionals, and requested that the Bankruptcy Court impose a cap on payment of those professionals.  On March 25, 2015, the Bankruptcy Court rejected these objections and approved the Committee's retention of professionals.[52]

### 3. Objections to the Consolidation of the Involuntary and

---

[49]     *See* Committee Order at 4.

[50]     *Id.* (citing *In re Dewey & LeBoeuf LLP*, No. 12-12321, 2012 WL 5985325, at *3 (Bankr. S.D.N.Y. Nov. 29, 2012)).

[51]     *See id.* at 6-8.

[52]     *See* Transfer Mem. at 10.

**Voluntary Cases**

After the Involuntary Case was transferred to Illinois, the Petitioning Creditors moved to consolidate the two proceedings so that CEOC's official filing date would be deemed January 12 (which would leave open the possibility of challenging the DACAs as preferences).  The First Lien Parties opposed the motion, arguing in part that the Involuntary Case was filed in bad faith "to gain leverage in the restructuring process and to preserve the opportunity to avoid a preference, notwithstanding that the Petitioning Creditors are contractually prohibited through an intercreditor agreement from challenging senior lender liens."[53]  The Ad Hoc First Lien Noteholders Committee and UMB asserted that the involuntary petition, if filed to "capture a preference," would "constitute a violation of the intercreditor agreement," and attached the ICA as "Exhibit A" to their objection.[54]

---

[53]     3/9/15 Objection of the Ad Hoc Committee of First Lien Bank Lenders to the Petitioning Creditors' Motion to Consolidate, Ex. A to the 6/11/15 Declaration of Lanora C. Pettit, counsel to plaintiff ("Pettit Decl."), ¶¶ 2, 12 ("Moreover, the filing of the involuntary petition exposes the Petitioning Creditors' other motivation — to attempt to use this Court for their own agenda and circumvent the restrictions imposed by their intercreditor agreement with the first lien lenders.") (internal footnotes, including one which cites to section 2.2 of the Intercreditor Agreement, omitted).

[54]     3/9/15 First Lien Notes' Joint Objection to Consolidation Motion (Bankr. N.D. Ill. 15-03193 ECF No. 34), ¶ 7.

The Debtors moved to suspend the proceedings related to the Involuntary Case. The Debtors argued that the DACAs were so crucial to the RSA negotiated with holders of first lien notes that their avoidance jeopardized the Debtors' ability to reorganize.[55] On March 25, 2015, the Bankruptcy Court denied the Debtors' motion, and deferred ruling on the motion to consolidate until after trial,[56] which is now scheduled for October 2015.[57]

## III.   APPLICABLE LAW

### A.   The Bankruptcy Removal Statute

Section 1452 governs the removal and remand of claims related to

---

[55]     *See* 3/18/15 Alleged Debtors' Omnibus Reply in Support of Motion to Suspend Proceedings Related to Involuntary Petition Pursuant to Section 305 of the Bankruptcy Code ("Reply in Support of Motion to Suspend") (Bankr. N.D. Ill. 15-03193 ECF No. 55), ¶ 25 ("Debtor entered into control agreements that perfected liens on certain cash [*i.e.*, the DACAs] as part of a six-month negotiation with senior creditors that eventually achieved the RSA. Debtor concluded that the RSA provides Debtor and its 172 subsidiaries with substantial benefits, including (a) support from the holders of almost $5 billion of the first lien notes for a comprehensive plan of reorganization, (b) a blueprint for negotiations with other stakeholders around a value maximizing reorganization strategy, and (c) contributions valued at a minimum of $1.5 billion from CEC to settle potential claims against CEC. If the Debtor consents to the involuntary petition date or it is otherwise forced upon Debtor prematurely, the RSA is likely to terminate and these benefits would be lost.").

[56]     *See* 3/25/15 Hearing Transcript, Ex. C to Pettit Decl., at 120:3-124:23. *See also* Plaintiff's Brief in Opposition to Defendants' Motion to Transfer Venue ("Transfer Opp."), at 19.

[57]     *See* Transfer Opp. at 20 n.10.

bankruptcy actions.  Subsection (a) permits removal of "any claim . . . in a civil action . . . to the district court for the district where such civil action is pending," if the district court has bankruptcy jurisdiction over the claim.  "Federal district courts have original, though not exclusive, jurisdiction over cases "arising under title 11 or arising in or related to a case under title 11."[58]  "Arising under" and "arising in" cases are core matters, while "related to" proceedings are non-core.

"'Arising under' jurisdiction exists where one invokes a substantive right created by federal bankruptcy law."[59]  "'[A]rising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."[60]  A proceeding is "related to" a case under title 11, "if the outcome of the litigation might have any conceivable effect on the bankruptcy estate, or has any significant connection with the bankrupt estate."[61]

---

[58]     28 U.S.C. § 1334(a).

[59]     *Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64, 70 (2d Cir. 2002).

[60]     *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987).  *Accord Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010) (same).

[61]     *Lead I JV, LP v. North Fork Bank*, 401 B.R. 571, 581 (E.D.N.Y. 2009) (quotation marks omitted).  *Accord Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether litigation has a significant connection with a pending

Subsection (b) provides that "[t]he court to which [a] claim or cause of action is removed may remand such claim or cause of action on any equitable ground." As one court explains, "[a]n "equitable" ground is one that is "fair and reasonable."[62] Other factors to be considered in remanding a case include: (1) whether issues of state law predominate; (2) whether judicial economy would be served by equitable remand; (3) whether § 1334(b) is the sole basis for exercising federal jurisdiction; (4) whether the proceeding involves non-debtors; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; and (6) the likelihood that the proceeding was commenced in a particular forum because of forum shopping on the part of one of the parties.[63]

### B.     Transfer of a Case or a Proceeding

Section 1412 provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." By its terms, this provision applies to bankruptcy cases as well as core proceedings. Non-core proceedings are governed by section 1404(a), which provides that "[f]or the convenience of parties and

---

bankruptcy proceeding is whether its outcome might have any conceivable effect on the bankrupt estate.") (quotation marks omitted).

[62]     *Shiboleth v. Yerushalmi*, 412 B.R. 113, 117 (S.D.N.Y. 2009).

[63]     *See id.* (citing *Rahl v. Bande*, 316 B.R. 127, 135 (S.D.N.Y. 2004)).

witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

The standards used to determine transfer under section 1412 and 1404(a) are substantially similar.[64] Courts typically consider such factors as: (1) the plaintiff's choice of forum; (2) the locus of operative facts; (3) convenience factors, such as the location of parties, witnesses, and evidence; (4) familiarity of the court with the applicable law; and (5) interests of justice, including trial efficiency.[65] "Although a plaintiff's choice of forum is normally given substantial weight, it is well-established 'that the existence of a related action pending in the transferee court weighs heavily towards transfer.'"[66]

In applying the "interest of justice" standard, the Second Circuit has recognized that "the district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a

---

[64]   *See Delaware Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500, 519 (S.D.N.Y. 2015); *Alliance Comm'cns Grp., Inc. v. Northern Telecom, Inc.*, 65 B.R. 581, 585 (S.D.N.Y. 1986).

[65]   *See CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*, 396 B.R. 602, 608 (S.D.N.Y. 2008) (citing *In re Northwest Airlines Corp.*, 384 B.R. 51, 60 (S.D.N.Y. 2008)).

[66]   *Id.* (quoting *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999)).

proceeding in bankruptcy."[67]  The Second Circuit also stated that the standard is "broad and flexible . . . [and] must be applied on a case-by-case basis [because i]t contemplates [ ] consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness-factors . . . ."[68]

### C.      Mandatory Abstention

The jurisdictional statute addressing bankruptcy cases and proceedings requires that district courts and bankruptcy judges abstain from hearing proceedings based on state law claims in certain circumstances. Abstention is mandatory under section 1334(c)(2) of Title 28 of the United States Code when the party seeking such abstention demonstrates that (1) it timely moved for abstention; (2) the proceeding is based on state law; (3) the proceeding concerns "non-core," as opposed to "core," bankruptcy claims; (4) there is no independent basis for federal jurisdiction other than bankruptcy jurisdiction; (5) the action was commenced in state court; and (6) the action can be "timely

---

[67]      *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990).

[68]      *Id.  Accord D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) ("District courts have broad discretion . . . and notions of convenience and fairness are considered on a case-by-case basis.") (citing *Cuyahoga Equip. Corp.*, 980 F.2d at 117).

21

adjudicated" in state court.

The Second Circuit explains that

"Four factors come into play in evaluating § 1334(c)(2) timeliness: (1) the backlog of the state court's calendar relative to the federal court's calendar; (2) the complexity of the issues presented and the respective expertise of each forum; (3) the status of the title 11 bankruptcy proceeding to which the state law claims are related; and (4) whether the state court proceeding would prolong the administration or liquidation of the estate."[69]

These four factors assist courts in weighing the "balance, struck by Congress, between, on the one hand, creating a federal forum for purely state law cases which, due to delay, might impinge upon the federal interest in the administration of a bankruptcy estate, and, on the other, ensuring that purely state law cases remain in state courts when they would not significantly affect that federal interest."[70]

## IV.   DISCUSSION

I have jurisdiction over this action pursuant to section 1334(b) of title 28 of the United States Code, which provides that "the district courts shall have

---

[69]    *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 671 F.3d 261, 266 (2d Cir. 2012) (per curiam) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 580 (2d Cir. 2011)).

[70]    *Id.* at 269 (citing *Silverman v. General Railway Signal Co. (In re Leco Enters., Inc.)*, 144 B.R. 244, 252 (S.D.N.Y. 1992) (stating that section 1334 mandatory abstention "comports with principles of federalism")).

original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[71]  At the very least this action is "related to" a case under title 11 in that it will have a conceivable effect on the pending bankruptcy.[72]

---

[71]     "'Proceedings' is interpreted broadly to include any civil matter or dispute that occurs during the administration of a bankruptcy case."  *In re New York Skyline, Inc.*, 512 B.R. 159, 172 (S.D.N.Y. 2014), *aff'd*, 601 Fed. App'x 52 (2d Cir. 2015).  Pursuant to Federal Rule of Bankruptcy Procedure 7001(10), "a proceeding to determine a claim or cause of action removed under 28 U.S.C. §1452" is an "adversary proceeding."

[72]     Plaintiff argues that "there is no basis for claiming that . . . [the First Cause of Action in the Complaint] even is 'related to' CEOC's bankruptcy . . . [because it] states a claim for breach of contract against [WSFS] for impermissibly exercising a right with respect to Common Collateral when it brought a fraudulent transfer action in August 2014, *five months prior to CEOC's bankruptcy*."  Memorandum of Law in Support of Plaintiff's Motion for Abstention or Remand ("Abstention Mem."), at 6 (emphasis in original).  However, the fact that the Wilmington Action was brought prior to the Bankruptcy Case is not relevant to whether the First Cause of Action is "related to" the Bankruptcy Case.  Whether an action is core or non-core is determined at the time an action is filed.  This action was filed *after* the filing of the Bankruptcy Case.  *See In re WorldCom, Inc. Sec. Litig.*, 294 B.R. 553, 556 (S.D.N.Y. 2003) (explaining that "the existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed") (internal quotation marks omitted).  The First Cause of Action is "related to" the Bankruptcy Case because it seeks to enjoin conduct relating to property of the estate (or property that was allegedly fraudulently transferred by the Debtors to non-debtor entities), and to prevent WSFS from challenging the B-7 Transaction.  Thus, this cause of action — which relates to both property of the estate and rights and prioritization among creditors — has a conceivable effect on the Bankruptcy Case.

## A.    Transfer[73]

While the parties dispute whether the claims are core or non-core, I need not resolve this issue.  This is because the considerations under section 1412 — which applies to core matters — and 1404(a) — which applies to non-core matters — are substantially the same.[74]  In this case, the fifth transfer factor — the interests of justice, including trial efficiency — outweighs all other factors, by far, and compels transfer to the Northern District of Illinois.[75]

---

[73]    Plaintiff argues that the "statutory [abstention] mandate controls here — and it does so regardless of whether transfer would otherwise be appropriate," and therefore I must *discuss* abstention before transfer in this Opinion and Order. Abstention Mem. at 6.  This argument is rejected.  *First*, I disagree that abstention is mandated here.  *Second*, because I am not ruling on the merits, the order in which I *decide* these issues is not legally significant.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (explaining that a "federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits'") (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).  While I recognize that courts often discuss abstention before transfer, addressing transfer first makes more sense here because the arguments in favor of transfer are unequivocal and inform the discussion of why abstention is neither mandated nor appropriate in this case.

[74]    *See Alliance Comm'cns Grp., Inc.*, 65 B.R. at 585.

[75]    As a threshold matter, this action could have been brought in the Northern District of Illinois, because the Bankruptcy Case is pending there and the parties have been active participants in that case.  *See* 28 U.S.C. § 1409(a) ("[A] proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district in which such case is pending.").  Following transfer of this matter to the Northern District of Illinois, it will be referred to the Bankruptcy Court pursuant to section 157(a) and the local order of reference.

### 1.    Existence of a Related Action

Plaintiff's choice of forum is heavily outweighed by "the existence of a related action pending in the transferee court . . . ."[76]  At its core, the Complaint seeks declaratory and injunctive relief,[77] the majority of which concern matters that are closely related to the Bankruptcy Case.  Credit Suisse seeks to enjoin defendants, including the Committee Defendants, "from taking any action to challenge, contest or support any other person in contesting or challenging, directly or indirectly, in any proceeding (including in CEOC's bankruptcy proceedings), the validity, perfection, priority or enforceability of any of the Bank Debt Liens"[78] and "from taking any action to enforce rights or exercise remedies with respect to the Property Transfers or the B-7 Transaction."[79]  This relief directly relates to the pending motion by the Petitioning Creditors to consolidate the bankruptcy cases, as well as the work the Committee Defendants are permitted, or expected to undertake, as statutory committee members.[80]

Credit Suisse also seeks to enjoin defendants "from seeking to recover

---

[76]    *CCM Pathfinder*, 396 B.R. at 608 (internal quotation marks omitted).

[77]    Damages are sought when specific performance is no longer possible.

[78]    Complaint ¶ 75.

[79]    *Id.* ¶ 76.

[80]    *See* 11 U.S.C. § 1103(c).

25

or causing the [Committee] to seek to recover for any professional fees incurred in connection with any action that violates the Intercreditor Agreement"; as well as to require defendants "to segregate and pay over for the benefit of holders of First Lien Debt any Common Collateral or proceeds thereof received by the holders of Second Lien Notes, including but not limited to any professional fees paid out of the Common Collateral or proceeds thereof," including amounts paid to members of or professionals appointed to represent the Committee.[81]  That relief also relates directly to the ability of the Committee Defendants to carry out their core duties under the Code.  After receiving the required approval from the Bankruptcy Court, the Committee Defendants have already retained various professionals.

### 2.   Plaintiff's Motive in Filing This Lawsuit in New York

Deference is ordinarily given to a plaintiff's choice of forum. However, where, as here, plaintiff does not bring suit in its home residence, "the degree of deference given to plaintiff's choice of forum depends on the motivations behind that choice."[82]  "A court must give greater deference to a plaintiff's choice of a non-home forum where that choice was 'motivated by legitimate reasons, including plaintiff's convenience and the ability of plaintiff to

---

[81]     Complaint ¶¶ 77, 78.

[82]     *Renaissance Cosmetics, Inc. v. Development Specialists Inc.*, 277 B.R. 5, 18 (S.D.N.Y. 2002).

obtain jurisdiction over the defendant.'"[83] Plaintiff argues that its choice to bring

this action in New York State court was for "the plainly legitimate reason that all

ten Defendants indisputably submitted to personal jurisdiction in New York."[84]

Just because plaintiff had the contractual right to bring suit in New

York State court, does not mean that doing so served a legitimate purpose. Courts

generally do not reward forum shopping. It is true that Credit Suisse is acting in

this suit in its capacity as agent under various agreements, including the Credit

Agreement, and not every plaintiff represented by Credit Suisse has necessarily

participated in the Bankruptcy Case. But it cannot seriously be disputed that the

First Priority Creditors are not only crucial to the success of the reorganization —

whether because of the RSA[85] or their concessions with respect to the use of cash

collateral[86] — but have been heavily involved in the Bankruptcy Case, asserting

---

[83]    *Id.* (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001)).

[84]    Transfer Opp. at 24.

[85]    As noted, the Debtors sought to stay the Petitioning Creditors' efforts to consolidate the Involuntary and Voluntary Cases, arguing that the DACAs were so crucial to the RSA negotiated with holders of first lien debt that their avoidance jeopardized the Debtors' ability to reorganize. *See* Reply in Support of Motion to Suspend ¶ 25.

[86]    The Final Cash Collateral Order (the "Cash Collateral Order") was entered in the Bankruptcy Case on March 25, 2015. *See* Bankr. N.D. Ill. ECF No. 988.

and specifically preserving their rights under the ICA throughout the bankruptcy proceedings.

In the Bankruptcy Case, UMB and other First Lien Secured Creditors argued that the Committee Defendants were prohibited under the terms of the ICA from performing many of the actions that committee members are permitted or even expected to undertake under the statute addressing the power and duties of committees.  The Bankruptcy Court determined that it did not have the power to disband the Committee and that

> Limiting the Committee's activities is not an option either. Section 1103 of the Code addresses the powers and duties of committees appointed under section 1102.  *See* 11 U.S.C. § 1103. Nothing in section 1103 authorizes a bankruptcy court to define those powers and duties in such a way as to place limits on a committee's activities beyond the limits in section 1103 itself. Neither [the Debtors] nor any of [their] allies has cited any authority supporting the existence of such a power.[87]

Based on this ruling, what legitimate purpose could Credit Suisse have in seeking an injunction from a New York state court prohibiting the Committee Defendants from carrying out their duties and responsibilities under section 1103?  I cannot think of any.  To the extent that plaintiff's interests were not adequately represented by UMB and the participating First Lien Priority Creditors, Credit

---

[87]     Committee Order at 8.

28

Suisse, a participant in the Bankruptcy Case,[88] could have joined in the motion as a party in interest.

Likewise, the Bankruptcy Court has approved the Committee Defendants' retention of professionals.  The retention of professionals by a committee is governed by the Bankruptcy Code, and requires the approval of the bankruptcy court.[89]  Multiple provisions of the Code govern compensation of such professionals, and professionals can only be compensated if the bankruptcy court enters an order approving such compensation.[90]  As the Bankruptcy Court has already approved the retention of professionals by the Committee, what legitimate purpose is there in asking a New York state court to enjoin the defendants from paying those professionals?  It would violate the compensation provisions to deny relief to these professionals on the grounds asserted in the Complaint.

------

[88]    Indeed, while the Cash Collateral Order expressly states that the First Lien Secured Parties are not required to file proofs of claim, Credit Suisse has nonetheless filed a proof of claim of over $5.3 billion on behalf of the First Lien Lenders.

[89]    *See* 11 U.S.C. § 1103(a) ("At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, *and with the court's approval*, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.") (emphasis added).

[90]    *See id.* §§ 328, 330, 331, 503.

In this context, filing this action in New York state court is transparent forum shopping.  The action was filed on April 7, two weeks after the Bankruptcy Court overruled the objections to the compensation of the professionals retained by the Committee and scheduled a trial on consolidation of the Involuntary and Voluntary Cases.  Even so, it is difficult to imagine that Credit Suisse actually believes that a New York state court or this Court would issue an injunction purporting to bar defendants from participating in the Committee or from pursuing relief with respect to the Involuntary Case.  Rather, the tactical advantage Credit Suisse likely seeks is a ruling that can be used preclusively in the Bankruptcy Case.  The effort to achieve that tactical advantage is not a legitimate purpose.

### 3. The Forum Selection Clause Does Not Control

Plaintiff argues that defendants waived their right to seek transfer from New York in the ICA's forum selection clause.[91]  To support this, plaintiffs cite to the Supreme Court's decision in *Atlantic Marine Construction Co., Inc. v. United States District Court for the Western District of Texas*, which held, in a different context, that "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases."[92]

---

[91]     *See* Transfer Opp. at 3.

[92]     134 S. Ct. 568, 582 (2013) (internal quotation marks and alterations omitted).

Plaintiff's argument is not persuasive.[93]  Assuming the forum

selection clause here is mandatory, "[t]he existence of a mandatory forum-selection

clause does not by itself dispose of a motion to transfer under § 1404(a)."[94]

Accordingly, it is still appropriate to consider the fifth factor (interests of justice,

including trial efficiency), which, in this case, is dispositive.  It also addresses the

concerns raised in *Atlantic Marine*, which was greatly informed by the notion that

> "enforcement of valid forum-selection clauses, bargained for by
> the parties, protects their legitimate expectations and furthers vital
> interests of the justice system."  For that reason, and because the
> overarching consideration under § 1404(a) is whether a transfer
> would promote "the interest of justice," "a valid forum-selection
> clause [should be] given controlling weight in all but the most
> exceptional cases."[95]

It is not difficult to conclude that enforcing the forum selection clause here would

not serve the interests of justice.  The palpable conflict between this action and the

Bankruptcy Case evokes a public interest sufficient to outweigh the forum

---

[93]     *Atlantic Marine* did not involve interference with a bankruptcy case,
and the Supreme Court remanded for a determination of whether any public-
interest factors might support denial of the motion to transfer.

[94]     *Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367,
394 (S.D.N.Y. 2006) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29
(1988)).

[95]     *Atlantic Marine*, 134 S. Ct. at 581 (internal citations omitted)
(alterations in original) (quoting *Stewart Org., Inc.*, 487 U.S. at 33 (Kennedy, J.,
concurring)).

selection clause.  The claims are "closely intertwined" with the proceedings in the
Northern District of Illinois.[96]  The rights that plaintiff seeks to enforce under the
contract are in direct conflict with defendants' status and rights under the
Bankruptcy Code.  Moreover, they undercut the power of the Bankruptcy Court
and jeopardize the legitimacy of the Debtors' reorganization.

Apart from impeding the functioning of a standing committee,
compelling defendants to take no action that runs contrary to plaintiff's interests
interferes with the bankruptcy in other respects, including by undercutting the plan
confirmation process.[97]  Indeed, plaintiff's attempt to cabin defendants' conduct, or
ramping up their leverage by instituting this suit, is antithetical to the workout
process.  A subordination agreement may be modified under a confirmed plan, and
as explained in a leading treatise,

> [o]ften, in reorganization cases, senior creditors may negotiate
> away rights to junior creditors in order to gain confirmation of a
> plan that will maximize the likelihood of the debtor's
> rehabilitation. . . . The legislative history to section 510 makes it
> clear that the section was not designed to thwart this process.  If
> a class that is a beneficiary of a subordination agreement later

---

[96]     *ResCap Liquidating Trust v. PHH Mortg. Corp.*, 518 B.R. 259, 268
(S.D.N.Y. 2014).

[97]     One result is that it may effectively disenfranchise defendants when
the Code specifically allows for voting on whether to accept or reject a plan.  *See
In re Adelphia Comm'cns Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006) ("A right
to vote on a plan is a fundamental right of creditors under chapter 11.").

accepts a plan that modifies or eliminates the subordination, then the agreement as modified, or eliminated, will be enforced in lieu of the original agreement. If subordination agreements were not waivable under a plan of reorganization acceptable to the senior creditor, the section would prevent just what Congress envisioned: that senior creditors may compromise with junior creditors in order to confirm a plan.[98]

Finally, the parties Credit Suisse represents have effectively consented to having the Bankruptcy Court interpret and enforce the ICA. In the introductory paragraph to the Complaint, Credit Suisse states that it is acting pursuant to "the written direction of the Required Lenders as defined in the Credit Agreement . . . ." However, the "Required Lenders" under the Credit Agreement, as well as the First Lien Noteholders and UMB, are parties to several stipulations entered into with WSFS in the Bankruptcy Case.[99] These stipulations — specifically contemplated by section 12(b) of the Cash Collateral Order — extend the time of WSFS, or any other interested party, to bring an action or proceeding to challenge, among other things, the validity of the security interests of the First Lien Secured Parties, including the DACAs.

### 4.    Transferring This Action Promotes Federal Policy and

---

[98]    4-510 Collier on Bankr. ¶ 510.03.

[99]    *See, e.g.*, 7/11/15 Notice of Filing of the Stipulation Pursuant to Final Chase Collateral Order Extending Challenge Period Regarding Leveraged Buyout (Bankr. N.D. Ill. 15-01145, ECF No. 1874 (citing the prior stipulations filed at ECF Nos. 1420, 1577, 1735, 1862).

**Efficiency**

As a general rule, when "substantially similar parties and claims are present in both courts," federal policy "favor[s] consolidation."[100]  Because this action involves issues that either have already been adjudicated by the Bankruptcy Court or will be adjudicated by the Bankruptcy Court, allowing multiple proceedings would "'simply complicate and slow down the resolution of the'" Bankruptcy Case.[101]  It would complicate the resolution of the Bankruptcy Case because it could raise difficult collateral estoppel issues.  It would slow down resolution of the Bankruptcy Case not only because of these collateral estoppel issues, but because it may also require coordination between the courts, and

---

[100]  *Cuyahoga Equip. Corp.*, 980 F.2d at 116-17 (stating that as a general rule, "two competing but related disputes brought in different fora should be consolidated in the court in which the first action was brought") (citing *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir. 1986); *William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969)).

[101]  *CCM Pathfinder*, 396 B.R. at 607 (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 311 B.R. 345, 349 (S.D.N.Y. 2003)).  *Accord Delaware Trust Co.*, 534 B.R. at 520 ("Litigating related actions in the same tribunal fosters efficient case administration, avoids needless expense, and avoids the risk of conflicting rulings.") (citing *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968); *SPV OSUS Ltd. v. UBS AG*, No. 15-cv-619, 2015 WL 4503521, at *5 (S.D.N.Y. July 1, 2015) ("[R]emand would require the issues presented in this case and the *Hill* Action to be adjudicated in parallel state and federal proceedings, creating the potential for duplicative discovery and motion practice and the risk of inconsistent rulings.").

because the case has been pending before the Bankruptcy Court since January 2015.

Plaintiff argues that the relief sought in this action would not prevent defendants from participating in the bankruptcy but rather it would simply prevent them from acting in such a way that violates the ICA.[102]  Plaintiff's argument proves too much.  By commencing an action in New York — rather than bringing an adversary proceeding or litigating the issues in contested matters in the Bankruptcy Case — plaintiff is asking another court to rule on whether the defendants' conduct in the Bankruptcy Case violates the ICA.  That situation is simply untenable.  Congress eliminated the need to have parallel proceedings of this kind when it empowered bankruptcy courts to interpret and enforce subordination agreements.[103]

That is not to say that, "'to be effective, a single tribunal must have broad authority to restructure debtor-creditor relations.' [Because] the framework Congress adopted in the 1984 Act already contemplates that certain state law matters in bankruptcy cases will be resolved by judges other than those of the

---

[102]      Transfer Opp. at 7-8.

[103]      *See* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.").

bankruptcy courts."[104]  There are countless situations in which actions that relate to the bankruptcy case will proceed in other jurisdictions.  For example, it is common for unliquidated claims against the debtor to be resolved in alternate fora.  Doing so will typically not impact the bankruptcy case because of provisions such as section 502(c), which permits the court to estimate contingent or unliquidated claims without having to actually resolve them.[105]  The difference between those actions and the present action is that — whether or not the claims are deemed core or non-core — the proposed action is blatant forum shopping, interferes with the bankruptcy process, and raises complicated issues of judicial comity, issue preclusion, and *res judicata*.[106]

### B.     Mandatory Abstention and Equitable Remand Are Unwarranted

Just as plaintiff did not bat an eye when arguing that this Court should simply enforce the forum selection clause and be done with it, plaintiff contends

---

[104]    *Stern v. Marshall*, 131 S. Ct. 2594, 2619 (2011) (internal quotation marks omitted).

[105]    *See also* 28 U.S.C. § 157(b)(2)(B) (referring to estimation of claims for limited purpose of confirming a plan); Fed. R. Bankr. P. 3018(a) (referring to the power of the bankruptcy court to "temporarily allow" a claim "in an amount which the court deems proper for the purpose of accepting or rejecting a plan").

[106]    In addition, insofar as the interpretation of the ICA "could affect the rights and prioritization among creditors, the interests of justice overwhelmingly dictate transfer to the court overseeing the bankruptcy proceedings." *Delaware Trust Co.*, 534 B.R. at 521 (internal quotation marks and alterations omitted).

with a straight face that abstention is required here by mechanical application of the statutory factors set forth in section 1334(c)(2).  However, section 1334(c)(2) only requires federal courts to cede jurisdiction over purely state-law matters when not doing so runs contrary to principles of federalism.  It does not divest federal courts of jurisdiction when a party seeks to undermine a bankruptcy case by attempting to litigate intercreditor disputes in multiple fora.

Abstention is not required where "the state court proceeding would prolong the administration or liquidation of the estate."[107]  I have previously noted that "[t]he Second Circuit has left open the issue of who bears the burden on the question of whether a case may be timely adjudicated in state court."[108]  In so doing, the Second Circuit stated that "[p]lacing the burden on the party seeking remand may nevertheless be inconsistent with the mandatory nature of abstention under § 1334(c)(2) as well as the principles of comity, which presume that a state court will operate efficiently and effectively."[109]  Based on this, I concluded, "particularly in the context of removal, where any doubts are to be resolved against

---

[107]   *Parmalat Capital Fin. Ltd.*, 671 F.3d at 266 (quotation marks omitted).

[108]   *BGC Partners, Inc. v. Avison Young (Canada), Inc.*, 919 F. Supp. 2d 310, 319 n.66 (S.D.N.Y. 2013).

[109]   *Id.* (internal quotation marks omitted).

removability, the burden should be on defendants to prove that the state court *cannot* adjudicate the claims in a timely manner."[110]

However, for the reasons already described above, defendants have more than satisfied their burden of showing that remanding this case will create inefficiencies and conflicts that will likely delay the resolution of the Bankruptcy Case. Likewise, equitable remand is unwarranted because it would promote forum shopping, the issues raised are closely related to issues in the Bankruptcy Case, and because judicial economy would not be served by such remand.

## V.   CONCLUSION

For the foregoing reasons, defendants' motion to transfer is GRANTED and plaintiff's cross-motion is DENIED. The Clerk of Court is directed to close these motions [Docket Nos. 29 and 32] and transfer this case to the United States District Court for the Northern District of Illinois.

SO ORDERED:



Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          September 9, 2015

---

[110]    *Id.* (emphasis in original).

**- Appearances -**

**For Plaintiff**:

Lawrence S. Robbins, Esq.
Ariel Lavinbuk, Esq.
Lanora C. Pettit, Esq.
Robbins, Russell, Englert, Orseck,
Untereiner & Sauber LLP
1801 K Street NW
Washington, DC 20006
(202) 775-4515

**For Defendants:**

Andrew I. Silfen, Esq.
Mark B. Joachim, Esq.
Michael S. Cryan, Esq.
Arent Fox LLP(New York)
1675 Broadway
New York, NY 10019
(212) 484-3929

Bruce Bennett, Esq.
Sidney Paul Levinson, Esq.
Joshua Mester, Esq.
Jones Day
555 S. Flowers St. 50th Floor
Los Angeles, CA 90071
(213) 489-3939